24-1214 John Hoak v. NCR Corporation and the Plan Administrator of the Plans of NCR Corporation. Mr. Hughes. Thank you, Your Honor. May it please the Court, Paul Hughes for the Plan Administrator. Everyone agrees that NCR was entitled to terminate the plans. Plaintiff also agrees that this authorized NCR to pay a lump sum. The only question is the amount of what that lump sum had to be. Plaintiff's theory is that this obligated NCR either to provide a replacement annuity or a lump sum that could have purchased a replacement annuity from a third-party insurer. The problem with that is it provides the plan beneficiaries something much more valuable than they had ex ante. That is foreclosed by Holloman for a few different reasons. The plan has language which says that the termination cannot adversely affect the beneficiaries, right? Yes, Your Honor. And more particularly, cannot adversely affect any singular participant, apostrophe S, accrued benefits. Yes, Your Honor, and I don't think that is meaningfully distinct from the same language in Holloman which says that there can be no reduction in benefits. Did the plan specifically reference applying actuarial standards? Well, Your Honor, I don't think there was anything particularly unique in terms of actuarial standards there. What this Court said was what matters is, is it actually equivalent? And here what the Court, everybody agrees that there is a right to terminate. So the question is, what does a right to terminate mean? That is a right to be able to accelerate the benefits. And what Holloman says, I think there are two aspects of Holloman that are key. The first is in terminating, the plan sponsor need not provide something that is more valuable to the plan participant than they had before. That's the first point. The second point that Holloman says, it is well established and accepted that in the course of a termination, one can use certain actuarial discounting assessment to bring the plan to the present day value. Let's talk about an example. And it might be different than the one that's discussed in the briefs. But using actuarial tables and believing that a specific beneficiary has a life expectancy of five more years, the plan pays that beneficiary, I'm just going to make up a sum that's even a million dollars, right? That beneficiary outlives that life expectancy by 15 years. How is that beneficiary not adversely affected by the lump sum $1 million payment? So a few different responses to that, Your Honor. Obviously, that is the key question here. And the essential point of the actuarial... ...is the plan had not been terminated, that beneficiary would have received the annuity for every month for the rest of his or her life. Totally understood, Your Honor. Let me get to it. Obviously, that's the core issue that we're facing here. So this is what is the quintessential point of the actuarial equivalent standard that Holloman discussed. Because ex-ante... Does Holloman say actuarially equivalent or actually equivalent? It says actually equivalent, and then it goes on to apply actuarial standards. So I submit, Your Honor... ...that it was submitted by the plan language itself. Well, I don't think there's anything that's so much more specific in Holloman. But if I can get, Your Honor, to the question that you're asking as to the life expectancy, the longevity risk, because as Your Honor points out, there could be a payment based on five years and somebody could live longer. The point of the actuarial equivalence is that when the conversion occurs, we cannot predict the future. We can't predict the future in multiple respects. But as you recall, that's the beneficiaries given the plan language. Well, no, Your Honor. That's where actuarial equivalence is critical. We can dispute as to whether or not we were correct on actuarial equivalence. That's a factual issue that was at the start of this case that plaintiffs largely moved away from to the new theory that was late-breaking. But here's why this issue is so critical. At the time of conversion, one does not know if somebody is going to live the 15 years, as Your Honor posits, or two years. Also, one does not know what is going to happen to investment risk in terms of do their investments perform better or worse than the default. The point is, if it is truly actuarially equivalent, and again, that's what we're assuming for purposes of, I think, Your Honor's hypothetical, a plan beneficiary is indifferent to either the lump sum or the annuity payment. You're assuming that actuarial equivalence is the same as not adversely affected. And those things are not necessarily one and the same. You could have plan language which says exactly what you say now. But this plan language doesn't say that. And I think, I speak only for myself, that you've got an uphill battle. But Your Honor, let me just take also your example of the lump sum that is paid. If the beneficiary does not want to bear any investment or longevity risk, nothing stops the plan participant, him or herself, from taking that lump sum and purchasing an annuity. Now, I recognize that money is not going to be sufficient, given, as you said, the actuarial reality that NCR relied on to buy an annuity for not just five years of life, but 20 years of life. So that beneficiary is adversely affected in his or her particular benefit. Because with a million dollars, they may only be able to buy an annuity for seven or eight or nine or ten years, but they're going to live 20. So at year 10, year 9, year 7, the money runs out and now they're deprived of a benefit for the rest of the 10 years of their life. Let me make a slight modification to that, but I don't disagree, Your Honor, with the principal point. But let me explain why that is not a problem for my case. Your suggestion is that the amount that's paid as a lump sum does not give them the identical annuity benefits. I agree with you in that regard. I don't think it would be a shorter number of years. It would be, because an annuity pays throughout the termination of somebody's life, it would be instead a lower amount per year. So one of these highly — Well, let me explain, Your Honor. So I agree, hypothetically, instead of having $100,000 a year, if they took the lump sum payment and went to a third-party insurer, it may be $90,000 a year instead of the $100,000. Here's the critical difference, and this is where actuarial equivalence comes in. That has essentially zero default risk. Dr. Krah, this is in the document 136-7, paragraph 109, and this is not, I don't think, disputed by plaintiffs in the Statement of Undisputed Material Fact, said there was a one in six chance that NCR, based on, at the time of 2013, its bonds were in junk bond status. It was a one in six chance for Dr. Krah that NCR was going to default on its debt. In the event of a default, the beneficiaries would receive nothing further because this was unsecured. So the point is, what — if it's actuarially equivalent, again, that's a factual dispute that we have deference over. But if it's actuarially equivalent, our submission is that the apples-to-apples comparison is the $90,000 a year benefit from a private insurer may well be equivalent, and it is — again, I'm using an example, I'm not saying these are the precise numbers. You're assuming that that 5% default, or whatever the default percentage or risk is, can be factored into this, and that's a separate issue, aside from whether or not you can terminate and provide a lump sum with so-called actuarial equivalence. Well, Your Honor, I think these are tied together because our — Not necessarily tied together. Our principal submission, Your Honor, is that — It's one thing to say that you can provide a lump sum that is tied to actuarial tables based on life expectancy. It's quite another thing to say that in reducing the lump sum to present value, under the terms of this plan, you are allowed to build in the risk of default that would have been borne by the beneficiaries as to NCRs. Well, let me just point out that the discount rate, the 5% that was used here, was more plan favorable than the 7% in Holloman, the 6% in Starr, both of which were affirmed. Now, the precise selection of that is a separate factual question, which was barely addressed by the district court, and we think requires the deferential standard that was never applied. Because, again, even if the Court doesn't think we have the best reading of the plain language, at the very least, there is a deferential standard under Firestone that would apply if the Court finds that we are not, as Lankinship says, quote, unquote, de novo correct. And it's that deferential standard is my secondary argument that the dis — Generally, that kicks in when you have plan language that can be interpreted in more than one way. And so the beneficiary says the plan language means X, the plan administrator says the plan language means Y, we have a use of discretion standard under ERISA because of the plan language, and we say the administrator's interpretation gets some deference. But how is the language using the term adversely affect ambiguous in any way, especially the traditional language that Judge Newsom quoted you? May I? Your Honor, I don't think the language adversely affect is in any way material distinct from the — the board shall make no reduction in benefits in Holloman. There is no bar in the plan language on what the administrator did here. In the absence of a bar precluding this, this is an appropriate interpretation of what it means to adversely affect. And at the very least, it is an interpretation of that language that is — is warranting deference, and it was that deferential framework that was not applied. Don't you think that the — maybe I'm fixated on this for bad reasons, but don't you think that the insertion of the singular participant is significant? It's not just adversely affect. It's adversely affect, in effect, any one participant's accrued benefits. And actuarially, some people are going to underlive the benefit, some people are going to outlive the benefit, and those who outlive are adversely affected. In other words, that's why you use the actuarial equivalence, because at the time that this is being made, you don't know what the outcome of that is going to be. I think, perhaps, that you have a deeply disadvantageous plan language here. This might have been bad drafting. Actuarially, you might want everybody to kind of come out in the wash. I understand the problem that you're positing. That's just not the language that you wrote into the plan. Well, I don't think that's right, Your Honor, because, again, when you say, is it disadvantaging, I think it's taken at the time that the plan is terminated, and there is no unique disadvantage to any one plan participant, because, again, a different hypothetical scenario, as I talked about, a one in six chance that NCR would have defaulted over the 20-year period of time, if we were in that hypothetical, which was unknowable in 2013, the plan participants would be thrilled at the lump sum, because then they would have received a significant payment in 2013, but had there been a default in 2016 or 2017, which the evidence shows was a realistic possibility, they would have received no benefits thereafter. So, again... But it's also possible that if you had drafted this plan with language that's much more advantageous to you now, you wouldn't have had top-high employees signing on, because they wouldn't have been as enticed by the benefit of this plan going forward, an annuity per month for the rest of his or her life. Your Honor, I just don't think that there is that distinguishment from Holloman, and You can cite that case like if it was binding, but it is distinguishable on so many rounds, starting with the plan language. Your Honor, the District Court in Taylor, of course, disagreed with that. The District Court in Starr, looking at a different plan, but using similar plan language, found that Holloman was quite instructive on this. And, again, I think, really, what is the quintessential right that the plan participants have is that it shall not adversely affect any participant's accrued benefits. When you use the actuarial standard... ...accrued benefit is an annuity for life. Well, the question now is what is actuarially equivalent to that, because... ...actuarial equivalence is baked into all of this. Your Honor, I think... We have never said that in any case without that plan language. What the logic of Holloman, Your Honor, is, is that upon a termination of a plan, that means the benefits are going to change in their character. Because there is an express right to terminate, that means there is a conversion. So what happens in that conversion... So you would pay them an amount of money that would have allowed them to purchase an identical annuity for the rest of their lives. You could have done that. It would not have been an identical annuity, because it would have been far more valuable since it would have had no default risk. You would have taken the NCR's default risk off the table. You could have done that, put in the default risk, and not used actuarial tables. Your Honor, I'm not sure how you could have built... I don't think so, Your Honor. There's no... Sure you could have. Your Honor... You just assume that everybody is going to live longer than the actuarial tables provide. So everybody gets the actuarial tables plus 10 to make sure that nobody outlives the benefit. And then you factor in the risk. Your Honor, I think we're talking past each other on this point. Because my point is that the default risk is the risk that NCR defaults. So in the status quo ante, before the conversion occurred, it was an unsecured plan. Such that if the 1 in 6 world came up where NCR defaulted on its debt, plan participants would receive zero dollars moving forward. They would have no benefits. But the beneficiaries are entitled to live with that risk and take that risk. They're like, you know what? NCR has been successful for a lot of years. I know it's got a lot of junk bonds and stuff. But I have a feeling that I'm going to outlive NCR. So I'll leave the risk of nonpayment. I'm using that $10,000 a month for the annuity in some cases. Your Honor, but that just I think goes to suggest that NCR couldn't terminate. They had a right to terminate. And when they terminated, they did not have to give something that was objectively more valuable than what the plan participants had prior to termination. I think that's the core teaching of Holliman. May it please the Court. My name is Michael Klenop and I represent the retired former NCR executives who participated in the five terminated plans at issue. I want to zoom out for a moment. You all made excellent points that I want to address. But it is undisputed that the plans at issue were defined benefit plans under ERISA. And defined benefit plans are so called for a reason. Because the benefits that participants will receive upon retirement are specifically defined in the written plan document. There should be no guesswork. It should be definitely determinable what the benefit is going to be when you retire. And the Hughes Aircraft case from the Supreme Court at 439 to 440 highlights that really well by drawing the essential distinction between a defined contribution plan and a defined benefit plan. A defined benefit plan is one that entitles a participant to a fixed periodic payment. Full stop. NCR's reading of the plan would turn it into an undefined benefit plan. Why? Because either you get this very specific annuity that we promised you with mandatory shall language, you will get this for life, which is the accrued benefit. Or in the alternative, we're going to choose to pay you something else that we deem reasonable. That is an undefined benefit plan, not a defined benefit plan. As with all defined benefit plans, accrued benefits in this plan were single life annuities. And of course, like all sponsors of defined benefit plans, the plan sponsors could write into the plan document alternative options for paying the accrued benefit. Do you agree that NCR could have paid, let's start out with generalities and then I'll build down from there, that NCR could have terminated with a lump sum? They could have paid, yes, they could have paid a single one-time payment, of course. That payment, in your view, has to be sufficient to be able to purchase the same annuity on the market, right? Correct, it has to be able to deliver the same accrued benefit that existed. How do you do that with actuarial tables? So the plan does not say anything about conversion to actuarial equivalent lump sums. That is an implied term that the plan administrator read into it. If you assume that this can be terminated through a lump sum payment, but the lump sum payment has to be sufficient for the person to buy an equivalent annuity on the market, how do you do that without actuarial tables? You don't use actuarial tables to find out what that amount is. You find out what the cost of a replacement annuity is and annuity providers use actuarial tables because they are now the ones who are bearing the longevity risk, providing the longevity insurance. They're the ones that are bearing the investment risk, just as NCR bore both of those risks before the plan termination. And they use actuarial tables and they use discount rates depending on the prevailing interest rates in the market at the time to price an annuity. And what the district court did in this case was awarded the PBGC discount rate. And there's a very specific methodology that the PBGC has used for decades where it surveys insurers in the market to find out what they're charging for specific annuities and it backs into a discount rate. So we're speaking on the same plane? Yes. Those are life annuities you're talking about? Absolutely, yes. And as with all defined benefit plans, the right to terminate in this plan is not unique to defined benefit plans. As the Beck case from the Supreme Court recognized, as the Carter case from the Seventh Circuit recognized, all plan sponsors have the right to terminate their plans. When you terminate a defined benefit plan, the default method of termination is buying a replacement annuity. Why? Because that is the only way that you deliver the accrued benefit that existed prior to termination. Of course, plan sponsors can put into the plan document an option to pay a lump sum, but it must be in the plan document in order to be an option. And under ERISA, it needs to be an option for the participant. The participant can't be forced to take it. And third, it has to use very specific participant-protective actuarial assumptions. Now, we're not saying that ERISA mandates the use of optional lump sums and actuarial assumptions in top-hat plans. It does not. But what that background context tells you is that if somebody wants to reserve the option to pay lump sums, then you put it in the plan document. That simply was not in the plan document. Turning to default risk, which is an important issue here, from a general contract perspective, as with so many other contracts, these plans allocated risks among the parties. And, of course, courts are loathe to reallocate risks different from the way in which the parties chose to allocate those risks. So how did the plans allocate risks in this case? They allocated longevity risk to NCR. All of these plan participants could have lived to 100. That was a risk that NCR bore. It was going to have to pay them those specific fixed periodic sums for the remainder of their lives. That is a risk that it bore. It also bore investment risk. Again, this is pretty much vanilla defined benefit plan stuff. It was responsible for funding those future benefits as they came due. It had the obligation to invest funds in a way that would allow it to satisfy those benefits in the future. Participants had the comfort of knowing that they were going to get these very specific amounts during the entirety of their lives during retirement, which allowed them to plan for retirement, allowed them to plan their income along with Social Security and the various other forms of retirement income that they had. So that was a risk that NCR bore. It is absolutely true that before the plans terminated, the plan participants bore the risk of default. That was also the allocation of risk under the plan. But there is a very important distinction because the participants bore the risk of default only because the plan was unfunded. What is a termination? A termination is a voluntary decision to fully fund and fully pay the accrued benefit. NCR, in the plans, by reserving the right to terminate, essentially reserved for itself the option to fully fund and fully pay the benefit. It voluntarily chose to eliminate default risk. It said, for our own administrative convenience, we are choosing to terminate these plans. We are taking it from unfunded status, which it would have been had the plans not terminated. We are paying you the full accrued benefit. It exercised that option. It cannot charge participants for an option that it selected that unilaterally and voluntarily chose to eliminate default risk. Are there cases anywhere in the country discussing the inclusion of that default risk in a lump sum payment? Not in the ERISA context that I'm aware of, Your Honor. But as an analogy, imagine that if these plans had given participants the option to elect lump sums, actuarially equivalent lump sums using 417 E-rates. Yes, at retirement or at any point in time. Let's say that was an option reserved for plan participants. The plan participant, when they retired, said, I elect the lump sum using 417 E-rates. They've made that election. They can't turn around and sue NCR and say, wait a second, you've got to pay me for longevity investment risk when they have exercised their option to transfer that risk back to NCR. NCR voluntarily chose to eliminate default risk. Just as the plan participant couldn't elect a lump sum and then sue NCR for the difference, the transfer of longevity and investment risk, neither can NCR unilaterally force participants to take a haircut for a default risk that it voluntarily chose to eliminate. What about NCR's reliance on our case in Holloman? The Holloman case is distinguishable on the facts that Your Honor previously mentioned. Explicitly reserved the right to accelerate the payment and explicitly mentioned the use of actuarial assumptions in calculating that accelerated payment. Now, there is some ambiguity in the decision as to exactly what those actuarial assumptions were. The plan did have mortality tables and provided for an 8% interest rate. But the plan administrator, when it terminated, actually used a more favorable 7% interest rate. So there were two primary contentions by the plaintiff in Holloman. One is that the plan was not allowed to pay lump sums. 100% dead wrong based on the plain language of the plan. The court quoted the provision in the plan that expressly unequivocally allowed the administrator to pay a lump sum. The second issue was the plan participant argued, you cannot discount my future payments by any amount whatsoever. I should get the nominal face value of those future payments that I would receive over the course of the next 20 years right now. And the court correctly rejected that too as a matter of common sense because, of course, future payments should be discounted to present value to account for the time value of money. That's what the court held. And, in fact, the court specifically suggested that the plan participants could have survived summary judgment had they presented evidence of the discount rates and mortality tables that private insurers were charging for similar annuities at the time that the plans were terminated. And that is an invitation to do exactly what the participants in this plan did. So we provided ample evidence of contemporaneous annuity pricing, including evidence that was presented to NCR at the time that it was deciding on its options of how to terminate the plans. And we opted ultimately for a very simple, non-speculative way to determine what the average cost of an annuity is at the time, which is the PBGC discount rate combined with the PBGC mortality table. It's a very simple methodology. It surveys insurers contemporaneously on a quarterly basis, and it tells you what the cost of a replacement annuity is. And, again, of course. Here's the way I understand the way this worked. Right or wrong, when NCR terminated, it figured out a lump sum using the actuarial tables and its risk of its own default and paid each participant a lump sum. Correct. Yes. Okay. I would assume that that lump sum payment, in every case, was higher than the monthly payments for at least a year, right? Correct. Okay. Even if the participants got shortchanged in the lump sum, if they had the access to the cash, more access to cash than they would have had over the relevant period of time, why should they get prejudgment interest when they undenied the use of the money? Because the breach was not in the termination, but rather the underpayment. But you're getting paid more than you were supposed to be paid. Well, that's not true because you're not getting paid more than you were supposed to be paid upon a proper plan termination. You're wrong. You've got the money in your pocket. Beneficiaries are supposed to get $10,000 a month in an annuity, right? Correct. The plan says, okay, we figured out your actuarial tables, our risk of default, whatever, whatever. We're giving you $2.5 million lump sum, right? Right. Over year one, year two, year three, and year four, and year five, that participant would have had, what, $600,000 of payment from the plan at $10,000 a month. They have 2.5. They've had access to more cash than the annuity promised them would have given them. They haven't been denied the use of the money for a period of time. Why do they get prejudgment interest? Because the appropriate but-for world is one where NCR voluntarily chose to terminate the plans, which it did, and paid them the right amount. And that underpaid them that amount. It's not as if the plan continued. Generally speaking, and I know it's partly equitable, but you get prejudgment interest if you've been deprived of a sum of money for a period of time that you could have invested or done something with. Here, they haven't been deprived of the money because they got more than their accrued annuity benefits would have been until the time of the district court's order. I disagree, Judge Jordan, because they got less than they should have gotten upon a proper termination. Again, the but-for world. I'm a judge. With my hypothetical beneficiary, at $10,000 a month, that beneficiary over five years gets $600,000, right?  If the lump sum was $1 million, $2 million, $3 million, $4 million, they've had more than the $600,000 over that period of time. Whatever they might have invested for the $600,000, they've been able to invest with the $1, $2, $3, or $4 million that they've been given. They've actually been able to make more money with regards to that if they wanted to. How have they been deprived of the chance to invest and earn money with the lump sum? Again, because the but-for world is not one where the plan didn't terminate. It's one where NCR paid them the appropriate amount of money at the time of plan termination. Let's make a really simple hypothetical. NCR chose to terminate the plans. It paid $1 million. The appropriate amount it should have paid when it terminated the plans was $1.5 million. It could have paid that amount to an annuity provider, or it could have paid that amount to the participant itself. The participant would have been in constructive receipt and would have had the economic benefit and ownership of the entire $1.5 million at the time of termination. It's not a but-for world where the plan would have continued and NCR continued making payments. NCR chose to terminate the plans. It chose to end the arrangement. It chose to relieve itself of the administrative hassle of continuing to administer these plans. It decided to pay an amount. That amount was smaller than it should have been, and it is that difference that the plaintiffs have been deprived of, and that is what the court awarded prejudgment interest on and notably much less prejudgment interest than it could have. So for prejudgment interest purposes, you're comparing lump sum to lump sum as opposed to lump sum to promised annuity? Correct. It's the appropriate amount of the lump sum as compared to the inadequate lump sum that NCR paid. Thank you very much. Thank you, Your Honor. Recognizing I think the court appreciates my breach arguments, I would like to start with the remedy questions, if I might. And if the court rejects our arguments on breach, it does turn to what is the equitable remedy in these circumstances. This is, as the court is well aware in ERISA, this is an exercise of the court's equitable authority. NCR submits that if we're wrong about the breach, our proposal on equitable remedies to the district court was by far the most equitable and the correct remedy, which is to put the planned participants back in the same economic situation they would have been ex ante prior to their claimed breach. Which is our proposal, Your Honor, which the district court rejected, is the district court would order under, as a remedy in this case, NCR to resume paying the annuities that would have been. Your Honor, what the proposal is, is that they've received a lump sum payment. Say they've received a million dollars. Say they were supposed to get $100,000 a year. That would have paid for 10 years' worth of benefits. If there's an underpayment from when that would have ended to today, NCR would pay a lump sum for that amount. If there's an overpayment, NCR would not begin paying the annuities until that's evened out. NCR has disclaimed any interest in any clawback if anyone pre-deceased and was entitled to more remedy. But NCR's fundamental position on the equitable remedy is the most fair position to actually give the planned participants what they say they want, which is maintaining the plan's initial conception of longevity risk and investment risk in that way and provide the benefits, is to have the court order NCR to provide those benefits. I don't think that's reasonable, but if you're talking about equity, the district court gets a certain amount of deference, and I'm not sure that the remedy it chose constitutes an abuse of discretion over your proposed remedy. Your Honor, I think what it does is it leads to a windfall that doesn't actually fit the claimed injury. Our claim is that if we're wrong and that NCR breached the plan, the participants should be put in exactly the same position they would have been but for the breach. In ERISA context, essentially a benefit restoral is a very common kind of circumstance. Here, recognizing the plans have terminated, it's very simple for the district court, instead of ordering lump sum payments, to order NCR, which NCR has acknowledged that if we're wrong about the breach, we would submit to of paying these participants the annuities from NCR on either a calendar year basis or a monthly basis, precisely pursuant to the underlying plan documents, that would have occurred ex ante. That is giving them exactly what the plaintiff said should have occurred, but for the breach. That is, in our view, clearly the most equitable result because it puts the plaintiffs in the position that they say they would have been but for the breach. How are these consequences handled with the lump sum payments? Howard, you mean what happened previously with the tax? When NCR terminated and made the lump sum payments, how were tax consequences handled? Your Honor, I don't know what the true up on tax consequences was. I think that was... Who was responsible for the taxes of the lump sum payments? Your Honor, standing here, I don't know who was responsible for the tax consequences. I can find that out and submit that to the court in a letter, but I don't want to answer inaccurately on that issue. If the court would like me to follow up, I'd be happy to. My question was going to lead to this. Did your proposal take into account those tax consequences? Yes, Your Honor. I can show. Dr. Craw had fully modeled how we provided as an attachment on the remedies phase to the district court what this would look like and how it would put plaintiffs in from an economic, including their tax-wise position, an identical situation had they been but for. And this was all based on the value of the lump sum that was paid and how that accounted for, you know, is it 8 years, 10 years, 12 years? Does NCR owe you a payment because, you know, they paid you 10 years' worth but it's been 12 years, so therefore there's a 2-year gap. We'll pay you that lump sum now and then put you on annuities going forward. That was all modeled very extensively in the expert report that was provided to the district court during the remedy phase. I don't think there was a disagreement from the plaintiffs that there was anything wrong about the calculations. It was simply a point that the plaintiffs wanted a lump sum payment now rather than a restoral of NCR-funded benefits that would return them precisely to the position of the underlying plan document. All right. Thank you very much. Thank you all.